## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JASMINE M. FERGUSON,

                            Plaintiff,

vs.

LEXISNEXIS RISK SOLUTIONS,

                           Defendant.

Civil Action No.:

**JURY TRIAL DEMANDED**

## COMPLAINT

Jasmine M. Ferguson, ("Plaintiff"), a living, breathing consumer, brings this Complaint against LexisNexis Risk Solutions ("LexisNexis") and states as follows:

## INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients

and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time they sell their credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      Defendant LexisNexis is a CRA as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f).

5.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

7.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

8.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of*

*one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

9.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

10.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." See 15 U.S.C. § 1681(a)(4).

11.     This action seeks actual, statutory, and punitive damages, costs and attorneys' fees for Plaintiff against Defendant for their willful and/or negligent

violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.,* as described herein.

## THE PARTIES

12.    Plaintiff Jasmine M. Ferguson ("Plaintiff") is a natural person who resides in the State of Ohio, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

13.    Defendant LexisNexis Risk Solutions ("LexisNexis") is a limited liability company that resides in the State of Georgia and in the Northern District.

14.    LexisNexis is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LexisNexis is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

16.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

17.   Plaintiff mailed multiple written disputes regarding inaccurate information in his LexisNexis credit report to LexisNexis located in Fulton County; Atlanta, Georgia.

18.   Defendant LexisNexis received Plaintiff's multiple written disputes in Fulton County; Atlanta, Georgia.

19.   Upon receipt of Plaintiff's disputes, Defendant LexisNexis forwarded such disputes to furnishers via Automated Consumer Dispute Verification electronic forms. Upon completion of its investigations furnishers responded to Defendant LexisNexis' electronic communications, which originated from Atlanta, Georgia, by sending its results electronically to Defendant LexisNexis in Fulton County; Atlanta, Georgia

20.   Defendant LexisNexis then processed the dispute results from furnishers at its National Consumer Assistance Center in Atlanta, Georgia, and mailed Plaintiff its final dispute results from Atlanta, Georgia.

## **FACTS**

### **Summary of the Fair Credit Reporting Act**

21.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

22.    The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

23.    The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

### The Credit Bureau's Processing of Credit Information

24.    Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

25.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

26.    Defendant collects information from thousands of furnishers.

27.    The process by which Defendant receives, sorts, and stores information is largely electronic.

28.    Furnishers report credit information to Defendant through the use of coded tapes that are transmitted on a monthly basis through software known as Metro 2.

29.    Defendant takes the credit information reported by furnishers and creates consumer credit files.

30.    Defendant maintains credit files on millions of consumers.

31.    Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

### LexisNexis' Mixed File Problem

32.    Defendant knows that different consumers can have similar names.

33.    Defendant knows that different consumers can have similar Social Security numbers.

34.    Defendant knows that different consumers with similar names can also have similar Social Security numbers.

35.   Defendant knows that public records often do not contain identifying information such as Social Security numbers or dates of birth.

36.   Defendant matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

37.   Defendant accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

38.   Sometimes Defendant's matching algorithms matches information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the industry as a mixed or merged credit file.

39.   Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the three major CRAs, Equifax, Experian, and Trans Union, regarding their significant failures and deficiencies with respect to mixed files.

40. Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant containing information belonging to another consumer.

41. A mixed or merged credit file is the result of Defendant inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

42. There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms (the database rules) used by Defendant to match personal identifying information and credit information, including public record information, to a particular consumer's credit file.

43. The success or failure of these algorithms and rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant.

44. A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant.

45.   These rules also determine which credit files are selected by the algorithm and merged to create a complete consumer report.

46.   Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

### The Credit Bureau Defendant's Practices Concerning the Sale of Credit Reports on the "Deceased"

47.   Defendant LexisNexis sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

48.   Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant LexisNexis, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

49.   Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

50.   Defendant LexisNexis routinely places a "deceased" notation or marking on credit reports when they are advised by any of their many data

furnishing sources (such as banks and debt collectors) that a given consumer is deceased.

51.    Defendant LexisNexis' furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

52.    Defendant LexisNexis does not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

53.    Defendant LexisNexis does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

54.    Defendant LexisNexis does not independently verify with any source or furnisher that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

55.    In some cases, in order to assure accuracy, Defendant LexisNexis may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers

to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant LexisNexis does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

56.   Defendant LexisNexis regularly receives the "Death Master File" from the Social Security Administration, including weekly and/or monthly updates, listing by social security number those consumers that the government believes to be deceased. But Defendant LexisNexis does not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

57.   Defendant LexisNexis will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

58.   Defendant LexisNexis does not employ any procedures at all to assure that a consumer with a "deceased" mark on their report is, in fact, actually deceased

before placing the "deceased" mark on that consumer's report and selling that report for profit.

59.   Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant LexisNexis does not employ any procedures to assure that a consumer with a "deceased" mark on their report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

60.   Even in instances where the purportedly deceased consumer communicates directly with Defendant LexisNexis, Defendant LexisNexis does not employ any procedures to assure that a consumer with a "deceased" mark on their report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

61.   Once a "deceased" mark is placed upon a consumer's report, Defendant LexisNexis will not calculate and will not provide a credit score for that consumer.

62.   Upon Defendant LexisNexis's reports with a "deceased" mark sold to third parties, Defendant LexisNexis never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

63.   Defendant LexisNexis knows that third party credit issuers require a credit score in order to process a given credit application.

64.    Defendant LexisNexis knows that consumers without credit scores are unable to secure any credit from most credit issuers.

65.    Defendant LexisNexis knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

66.    Defendant LexisNexis has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

67.    Defendant LexisNexis has received and documented many disputes from consumers complaining that their credit reports had them erroneously marked as "deceased."

68.    Defendant LexisNexis knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, even when said consumers (and their dates of birth and social security numbers) are not on the Death Master File and are, in fact, alive.

69.    Nevertheless, Defendant LexisNexis does not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is, in fact, deceased.

70. Even consumers who dispute the erroneous "deceased" status on their LexisNexis credit report continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

71. Defendant LexisNexis does not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

72. Nor does LexisNexis employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

73. For years after a consumer's actual death, Defendant LexisNexis will continue to sell credit reports about that consumer.

74. Defendant LexisNexis will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

75. Defendant LexisNexis charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

76. Defendant LexisNexis profits from the sale of reports on deceased consumers.

77. Defendant LexisNexis has in their credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

78. Defendant LexisNexis know that truly deceased consumers do not apply for credit.

79. Defendant LexisNexis knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant LexisNexis to be a common and major source of identity theft.

80. Defendant LexisNexis knows that identity theft and credit fraud are serious and widespread problems in our society.

81. Defendant LexisNexis warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the

deceased, and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

82.   Defendant LexisNexis has no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

83.   Defendant LexisNexis sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

84.   For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant LexisNexis to sell their credit reports, absent a court order.

85.   Defendant LexisNexis knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Sees that Defendant LexisNexis is Reporting Deceased on September 2, 2022**

86.   As of September 2, 2022, a deceased notation was reflected in the Plaintiff's LexisNexis credit report:

> Date of Death: November 15, 2014

87.   As of September 2, 2022, the above-referenced notation was reporting inaccurately in Plaintiff's LexisNexis credit report because Plaintiff is not deceased.

**Flexshopper, LLC Denies Plaintiff Credit Card Due to Defendant LexisNexis' Inaccurate Credit Reporting on September 12, 2022**

88.   On or about September 12, 2022, Plaintiff sought to obtain credit for a credit card and submitted a credit application.

89.   Shortly thereafter, in or about September 12, 2022, Flexshopper, LLC denied Plaintiff's credit application based upon the contents of Plaintiff's credit report.

90.   Specifically, LexisNexis was reporting deceased on Plaintiff's credit report.

91.   Plaintiff takes great pride in Plaintiff's good name and established credit rating and works hard to ensure that Plaintiff's bills are paid in-full and on-

time each month. Plaintiff believes and understands that Plaintiff's credit record with Plaintiff's creditors is good, so Plaintiff could not imagine how Plaintiff's credit application had been denied.

### Plaintiff's Dispute with LexisNexis on September 13, 2022

92.   On or about September 13, 2022, feeling shocked, surprised, and embarrassed because of Defendant's inaccurate reporting, Plaintiff mailed a written dispute via certified mail/disputed by telephone to LexisNexis, disputing the deceased notation in Plaintiff's credit report. Plaintiff requested that LexisNexis reinvestigate the disputed information, correct the reporting, and send corrected copies of Plaintiff's credit report.

93.   Plaintiff's September 12, 2022 dispute specifically included Plaintiff's full name, date of birth, Social Security number, and current address so that the credit bureaus would be able to properly identify and locate Plaintiff's credit file.

### The Credit Bureaus' Method for Considering Consumer Credit Report Disputes

94.   The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

95.    The credit bureaus, LexisNexis, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

96.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."  It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

97.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

98.    Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

99.   The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

100.  These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

101.  Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

102.  The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

103.   Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**LexisNexis' Response to Plaintiff's September 2022 Dispute**

104. Following the dispute, LexisNexis completed its reinvestigation of Plaintiff's dispute and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation to Plaintiff. LexisNexis failed to properly reinvestigate and delete the deceased notation on the disputed credit account, which continued to appear on Plaintiff's LexisNexis credit report.

**Plaintiff's Mixed LexisNexis Credit File as of October 17, 2022**

105. Upon information and belief, as of October 17, 2022, Plaintiff's LexisNexis credit report contained the following name, which belongs to another consumer:

Jamie Ferfuson

106. Plaintiff's LexisNexis credit report contained the following deceased notation in the Plaintiff's LexisNexis credit report:

Date of Death: November 15, 2014

107. Plaintiff's LexisNexis credit report contained a social security number which belongs to another consumer.

108. Defendant mixed another consumer's personal and account information into Plaintiff's credit reports despite the fact that numerous discrepancies exist

between their personal identification information. The discrepancies that should have caused Defendant to realize Plaintiff is not the same person as this other consumer include the following:

    a) Plaintiff's legal name is Jasmine M. Ferguson and the personal and account information Defendant mixed into Plaintiff's credit reports belongs to another consumer; and

    b) Plaintiff's Social Security number is different than the other consumer's Social Security number.

**Capital One Bank Denies Plaintiff Credit Card Due to Defendant LexisNexis' Inaccurate Credit Reporting on October 19, 2022**

109. On or about October 19, 2022, Plaintiff sought to obtain credit for a credit card and submitted a credit application.

110. Shortly thereafter, in or about October 19, 2022, Capital One Bank denied Plaintiff's credit application based upon the contents of Plaintiff's credit report.

111. Specifically, LexisNexis was reporting deceased on Plaintiff's credit report.

112. Plaintiff takes great pride in Plaintiff's good name and established credit rating and works hard to ensure that Plaintiff's bills are paid in-full and on-

time each month. Plaintiff believes and understands that Plaintiff's credit record with Plaintiff's creditors is good, so Plaintiff could not imagine how Plaintiff's credit application had been denied.

### Plaintiff's Dispute with LexisNexis on November 16, 2022

113.  On or about November 16, 2022, feeling shocked, surprised, and embarrassed because of Defendant's inaccurate reporting, Plaintiff mailed a written dispute via certified mail/disputed by telephone to LexisNexis, disputing the deceased notation in Plaintiff's credit report. Plaintiff requested that LexisNexis reinvestigate the disputed information, correct the reporting, and send corrected copies of Plaintiff's credit report.

114.  Plaintiff's November 16, 2022 dispute specifically included Plaintiff's full name, date of birth, Social Security number, and current address so that the credit bureaus would be able to properly identify and locate Plaintiff's credit file.

### LexisNexis' Response to Plaintiff's November 2022 Dispute

115.  Defendant LexisNexis did not respond to Plaintiff's dispute.

116.  Defendant LexisNexis did not indicate that Plaintiff's dispute was found to be frivolous or irrelevant.

117.  Defendant LexisNexis failed to conduct a reasonable reinvestigation of Plaintiff's dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

118.  Defendant LexisNexis failed to provide the requested credit disclosure in violation of 15 U.S.C. § 1681g.

119.  In the last two years, Plaintiff has disputed the Defendant's reporting Plaintiff as deceased, causing credit denials, which will be further identified during discovery.

120.  At all times pertinent hereto, Defendant LexisNexis was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

121.  At all times pertinent hereto, the conduct of Defendant LexisNexis, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

122. As a result of the "deceased" annotations contained throughout Plaintiff's credit reports, Defendant LexisNexis made it practically impossible for Plaintiff to obtain credit.

123. As a standard practice, Defendant LexisNexis does not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the furnisher despite numerous court decisions admonishing this practice. See Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d Cir. 1997) ("The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); Apodaca v. Discover Fin. Servs., 417 F. Supp. 2d 1220, 1230–31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); Gorman v. Experian Info. Sols., Inc., 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

124. Consistent with their standard policies and procedures, Defendant LexisNexis automatically generated their "investigation" results once the aforementioned furnishers provided their responses to Plaintiff's disputes,

verifying that Plaintiff was deceased, and no employee from any of the credit bureaus took any additional steps to review Plaintiff's documentation, information, or the Social Security Administration's ("SSA") Death Master File, which Defendant purchases from the SSA, after the furnishers provided their responses to Plaintiff's disputes.

125. Instead, Defendant LexisNexis blindly accepted the aforementioned furnishers' incomplete version of the facts and continued to report the inaccurate, derogatory information on Plaintiff's credit reports, namely, that he is deceased.

126. Defendant LexisNexis continues the practice of parroting the response from furnishers even though they have been repeatedly sued for failing to conduct reasonable investigations as required by the FCRA.

127. Defendant LexisNexis do not intend to modify their dispute-processing procedures because doing so would drastically increase their operating expenses.

128. Instead, Defendant LexisNexis intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendant LexisNexis' violations of the FCRA are willful.

129. At all times pertinent hereto, Defendant LexisNexis was acting by and through their agents, servants, and/or employees who were acting within the course

and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

130.  At all times pertinent hereto, the conduct of Defendant LexisNexis, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

131.  Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-130 as if fully stated herein.

132.  The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

133.  On multiple occasions, Defendant LexisNexis prepared patently false consumer reports concerning Plaintiff.

134. Despite actual and implied knowledge that Plaintiff is not dead, Defendant LexisNexis readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

135. Defendant LexisNexis violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintain concerning Plaintiff.

136. As a result of Defendant LexisNexis' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his/her1 credit; being chilled from seeking credit opportunities; the expenditure of time and money disputing and trying to correct the blatantly inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, fear of financial difficulty, and the inability to obtain credit for important life purchases.

137. Defendant LexisNexis' conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

138.  Plaintiff is entitled to recover attorneys' fees and costs from Defendant LexisNexis in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendant LexisNexis)

139. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-130 as if fully stated herein.

140. The FCRA mandates that Defendant LexisNexis conduct an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act impose a 30-day time limitation for the completion of such an investigation. Id.

141. The FCRA provides that if Defendant LexisNexis conduct an investigation of disputed information and confirm that the information is in fact inaccurate, or are unable to verify the accuracy of the disputed information, they are required to delete that item of information from the consumer's file. See 15 U.S.C. § 1681i(a)(5)(A).

142. On multiple occasions during 2020 and 2021, Plaintiff sent written disputes to Defendant LexisNexis, pleading with them to comply with their statutory reinvestigation obligations and correct and/or delete specific items in his/her1 credit files that are patently inaccurate, misleading, and highly damaging to him and his ability to obtain credit, namely, references to him being "deceased."

143. Either Defendant LexisNexis conducted no investigation of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit files, namely, the deceased notations.

144. Defendant LexisNexis violated 15 U.S.C. § 1681i on multiple occasions by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files.

145. As a result of Defendant LexisNexis's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; being chilled from seeking credit opportunities; the

expenditure of time and money disputing and trying to correct the blatantly inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, fear of financial difficulty, and the inability to obtain credit for important life purchases.

146. Defendant LexisNexis' conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

147.  Plaintiff is entitled to recover attorneys' fees and costs from Defendant LexisNexis in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**

**15 U.S.C. § 1681g**

**Failure to Provide Disclosures to Plaintiff**

148. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-130 as if fully stated herein.

149.  Defendant violated 15 U.S.C. § 1681g by failing to provide Plaintiff's credit disclosure after each request.

150. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from

Plaintiff's credit; detriment to Plaintiff's credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment.

151.  Defendant's conduct, action, and inaction was willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

152.  Plaintiff is entitled to recover attorney's fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)      Determining that Defendant negligently and/or willfully violated the FCRA;

b)      Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs as provided by
      the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem
      appropriate and just.

### DEMAND FOR JURY TRIAL

153.   Plaintiff demands a trial by jury.


Dated:       August 23, 2024

> */s/ Joseph P. McClelland*
> Joseph P. McClelland
> LAW FIRM OF JOSEPH P.
> MCCLELLAND, LLC
> Georgia Bar No: 483407
> 235 East Ponce de Leon Avenue,
> Suite 215
> Decatur, GA 30030
> Telephone: (770) 775-0938
> Fax: (470) 468-0070
> Email: joseph@jacksonlaws.com
>
> *ATTORNEY FOR PLAINTIFF*